UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MJJ TRUCKING LLC,

                Plaintiff,

  - against -

BD HAULERS, INC., FRANK GILLETTE,
and FIDELITY AND DEPOSIT COMPANY
OF MARYLAND,

                Defendants.
------------------------------------------------------------X

MEMORANDUM
AND ORDER
09-CV-3201 (SMG)

GOLD, S., U.S.M.J.:

## Introduction

Plaintiff MJJ Trucking LLC ("MJJ") brings this action pursuant to New York State Finance Law Section 137(3) against Fidelity and Deposit Company of Maryland ("Fidelity").[1] Plaintiff seeks to recover the unpaid balance due for work it performed for BD Haulers, Inc., ("BD"), a subcontractor on a municipal construction project. Defendant Fidelity provided a surety bond for the general contractor on the project, Perfetto Contracting Co. ("Perfetto").

The primary issue in dispute is whether plaintiff complied with the notice requirements of § 137(3). On March 19, 2010, I held a bench trial. Following the trial, the parties submitted written summations and replies addressing whether notice was sufficient under § 137(3) and whether attorney's fees should be awarded to the prevailing party. For the reasons set forth below, I find that plaintiff complied with the notice requirements of § 137(3) and that Fidelity is therefore liable to plaintiff in the amount of $255,591. I also conclude that plaintiff's application for attorney's fees pursuant to § 137(4)(c) should be denied.

---

[1] Plaintiff obtained a default judgment against defendants BD Haulers, Inc., and Frank Gillette on February 5, 2010. *See* Order dated February 5, 2010.

**Facts**

In July 2008, MJJ contracted with BD to remove debris on a construction project where BD was a subcontractor of Perfetto, the general contractor. Tr. 23-24, 68-69. As noted above, Perfetto obtained a surety bond in connection with the project from defendant Fidelity.

Jose Alvarado ("Jose"), vice president of MJJ, testified that, at some point during the project, BD stopped paying MJJ's invoices, and that he then approached Perfetto in an attempt to get paid. Tr. 31-32, 34, 39-40. Jose first tried to call Perfetto's president, Cesare Perfetto ("Cesare"), but was unable to reach him by telephone. Tr. 40-41. Thereafter, on November 24 or 25, 2008, Jose and his wife, Mayra Alvarado ("Mayra"), president of MJJ, went to an address of a Perfetto office in Staten Island they found by researching the name Perfetto online. Tr. 41-42, 111-12, 117. Both Jose and Mayra testified that they brought with them BD's unpaid invoices in a yellow envelope, and that they showed the invoices to two women at the Staten Island office. Tr. 41-42, 46, 112-13, 115. After looking at the invoices, the women informed the Alvarados that the general contractor on the construction project indicated on the invoices was Cesare Perfetto, whose office was located in Brooklyn, and that they were at the office of Cesare's brother, Carlos Perfetto. Tr. 41-42, 113. One of the women gave Mayra a business card, and Mayra wrote down the address of the Brooklyn office on the back of the card. Tr. 42, 113; Pl. Ex. 20.

The Alvarados then went to the Brooklyn office, where they met with Cesare's secretary, Linda Palermo ("Palermo"). Tr. 43, 114. Jose informed Palermo that the purpose of their visit was to talk to Cesare about the unpaid invoices. Tr. 43, 114-15. Jose and Mayra testified that Palermo told them that Cesare was unavailable, but that she would give Cesare the envelope

containing the invoices and Jose's phone number when Cesare returned. Tr. 43-44, 47, 114-15. Mayra testified that Palermo gave her a business card before they left. Tr. 115; Pl. Ex. 21.

Jose received a phone call from Cesare while he and Mayra were driving home from Cesare's office. Tr. 47. Jose testified that he and Cesare spoke for forty minutes, a fact that was corroborated by cell phone records indicating that Cesare called Jose on November 24, 2008 and that the phone call lasted forty-three minutes. Tr. 47, 50-51; Pl. Ex. 22. Jose told Cesare that MJJ's invoices for the BD job totaled more than $400,000, but that BD had paid MJJ only about $150,000 or $160,000. Tr. 48. Jose asked Cesare whether Perfetto still owed money to BD and suggested that, if so, Perfetto pay MJJ instead. Tr. 48. Cesare refused to go along with Jose's suggestion, but told Jose that Frank Gillette, the owner of BD, was getting paid on the job and that Cesare would talk to Gillette about paying MJJ. Tr. 48-49.

After his conversation with Cesare, Jose received a phone call from Gillette's lawyer, Ronald Weisenberg. Weisenberg told Jose that BD's position was that it did not owe MJJ any more money. Tr. 51. Jose told Weisenberg that MJJ had a claim for $274,000 and that MJJ would file a claim in court. Tr. 51.

About two to three weeks after their first visit, the Alvarados, this time together with two other contractors who worked for MJJ on the BD job and who also had not been paid, returned to Perfetto's Brooklyn office. Tr. 52-53, 116. Mayra waited in the car while Jose and the two others went upstairs. Tr. 116. Palermo greeted them again and told them that Cesare was not available. Tr. 53-54. Jose asked Palermo if she gave Cesare the envelope containing the unpaid MJJ invoices he had provided to her on his first visit, and Palermo replied that she had put it on Cesare's desk. Tr. 53. Jose and the two contractors then waited outside Perfetto's office for about ten minutes, but when Cesare did not appear, they left. Tr. 54, 116. Sometime thereafter,

3

Cesare called Jose, and Jose again pressed Cesare about getting paid. Tr. 54. Cesare replied that they would have to turn the matter over to their lawyers. Tr. 54.

Cesare's testimony was in several respects consistent with the testimony of the Alvarados. According to Cesare, he learned about both of the Alvarados' visits to his office from Palermo. With respect to the first visit on November 24 or 25, 2008, Cesare testified that that Palermo left him a message on his desk with Jose's phone number on it, but that he did not receive anything else. Tr. 131-32. Palermo informed Cesare that people had come to the office that day and wanted to meet with him about monies they claimed were owed to them. Tr. 131-32. Cesare testified that he recalled a telephone conversation with Jose on November 24 that lasted about five or ten minutes, during which Jose told him that MJJ was owed "approximately between $465,000 to a half million dollars." Tr. 132-33, 149. Cesare told Jose that he was paying BD weekly and that Jose should discuss the matter with Gillette because MJJ did not have a contractual relationship with Perfetto. Tr. 133. Cesare subsequently called Gillette, who told Cesare that he was paying MJJ's invoices. Tr. 150.

Cesare, like the Alvarados, recalled a second visit to his office. With respect to this second visit, Cesare testified that Palermo called him to report to him that there were people in his office, that she was intimidated by them, and that they were demanding monies for unpaid invoices. Tr. 134. Following this visit, Cesare called Jose again, and also called Gillette to tell him about MJJ's complaints. Tr. 134. Cesare stated that Gillette told him that BD was paying MJJ, and that any discrepancy between BD and MJJ about amounts due concerned deductions for union dues. Tr. 134. Cesare also acknowledged that Gillette came to his office to discuss the issue of payment to MJJ four to five times in December 2008. Tr. 151-52, 154. Cesare believed Gillette when he stated that MJJ was getting paid, but also acknowledged on cross-examination

4

that a claimed unpaid balance exceeding $400,000 – like the amount, according to Cesare, Jose claimed was due – indicated that the disagreement between BD and MJJ must have involved more than a discrepancy over union dues. Tr. 151, 156.

Cesare stated that he first saw MJJ's invoices in the spring of 2009, when he was notified of its claim in a letter from his bonding company. Tr. 163-65. Cesare testified that he noticed upon reviewing the invoices that some of the charges were for his brother's project and not for his. Tr. 162-63.

Palermo testified that she has worked as a receptionist for Perfetto for three years. Tr. 175. In contrast to the Alvarados and Cesare, Palermo recalled only one visit by the Alvarados. Tr. 180-181. Although Palermo testified that she was at work on November 24 and 25, 2008, she could not recall if the visit from the Alvarados was on either of those two days. Tr. 176. As Palermo recalled it, there were three visitors, two of whom were Jose and Mayra, and they wanted to see Cesare about monies owed to them by BD. Tr. 177-78. Palermo testified that she was intimidated by the group and felt anxious about having let them into the building. Tr. 177. She told them Cesare was not available, gave them a business card, and wrote Jose's phone number on a post-it that she put on Cesare's desk. Tr. 179. After they left, Palermo and another co-worker looked outside and saw the Alvarados and others standing in the street. Tr. 179. Palermo then called Cesare to tell him that people from MJJ were at the office and that they wanted to see him. Tr. 180.

At her deposition, Palermo testified that she did not remember receiving a package from Jose and did not think that she had. Tr. 183. At trial, Palermo testified that she had given the matter more thought and could now state definitively that she did not receive any such package. Tr. 184. Although Palermo was unsure about whether there were one or two visits, she testified

5

that she was now certain she never received a package because she would have put it on Cesare's desk along with the post-it note. Tr. 184-85.

## Discussion

A. Section 137(3)

New York Finance Law Section 137 is modeled after the federal Miller Act, 40 U.S.C. § 3133. Both federal and state courts have held that the primary purpose of these statutes is "protecting persons furnishing labor and materials on . . . public works projects." *Dutchess Quarry & Supply Co. v. Firemen's Ins. Co. of Newark, N.J.*, 596 N.Y.S.2d 898, 900 (3d Dep't 1993) (citing *United States v. Andrews*, 406 F.2d 790 794 (4th Cir. 1969)). As one of the means of providing such protection, the statutes require general contractors on municipal construction projects to post surety bonds that guarantee payment to persons supplying labor or materials. *See* 40 U.S.C. § 3131(b)(2); N.Y.S. FIN. LAW § 137(1). Subsection (3) of the New York State statute permits a party, such as MJJ, who has furnished labor or material to a subcontractor but has no contractual relationship with the general contractor, to recover on the payment bond for amounts due from the subcontractor. However, the party seeking recovery on the payment bond – here, MJJ – must comply with the notice requirements set forth in the statute. Thus, a sub-subcontractor will have no right of recovery against the general contractor unless he provides

> *written notice* to [the] contractor within one hundred twenty days from the date on which the last of the labor was performed . . . , stating with *substantial accuracy the amount claimed and the name of the party . . . for whom the labor was performed*. The notice shall be served by *delivering the same personally to the contractor* or by mailing the same by registered mail . . . ; *provided, however, that where such notice is actually received by the contractor by other means, such notice shall be deemed sufficient*.

*Id*. § 137(3) (emphasis added).

The parties dispute whether the notice MJJ provided to Perfetto was sufficient to meet these statutory requirements. First, plaintiff contends that the Alvarados personally delivered written notice to Perfetto, whereas defendant denies receiving the delivery. Second, and assuming written notice was not provided, plaintiff argues that the last clause of the statute— "where such notice is actually received by the contractor by other means"—allows for oral notification of a claim to the general contractor. Defendant counters that the phrase "by other means" does not refer to oral notification, but rather allows for written notification to be delivered by means other than personal delivery or registered mail. Third, defendant argues that, even if plaintiff personally delivered the unpaid MJJ invoices, notice was insufficient because plaintiff failed to state the amount owed with "substantial accuracy," and because Jose failed to alert Cesare of his intent to pursue Perfetto for payment. I address each of these arguments in turn.

    a. *Written notification requirement*

Plaintiff asserts that it provided notice of its claim in the following ways: 1) the Alvarados' personal delivery of unpaid invoices to Perfetto's Brooklyn office on November 24 or 25, 2008; 2) a forty-three minute conversation between Jose and Cesare on November 24, 2008, about the amount owed; 3) the second visit by the Alvarados and two other contractors to Perfetto's office; and 4) meetings between Cesare and Gillette in December 2008, during which MJJ's claim was discussed. Pl. 4/9/10 Ltr., Docket Entry 22, at 3-5. It is undisputed that MJJ's last day of work on the project was on or about October 8, 2008, and that any notice received before February 5, 2009 would have been timely.

I find that plaintiff has proven by a preponderance of the evidence that the Alvarados personally delivered the unpaid invoices to Perfetto's Brooklyn office on November 24 or 25,

2008. The testimony of Jose and Mayra was consistent and credible. Both testified that they found an address for a Perfetto in Staten Island online and that they went to that address on November 24 or 25, 2008, bringing along the unpaid invoices in a yellow envelope. They further testified that it was by examining these invoices that the two women at the Staten Island office were able to determine that the Alvarados were seeking payment for work performed on Cesare's job. At trial, the Alvarados corroborated their testimony by offering into evidence a business card from the Staten Island office with Perfetto's Brooklyn address written on the back. The Alvarados both testified that they then went to the Brooklyn office and that they left the envelope containing the unpaid MJJ invoices with Palermo to deliver to Cesare. Plaintiff also produced a business card from the Brooklyn office, and Palermo confirmed in her testimony that the Alvarados took a business card. After leaving Perfetto's office, Jose received a phone call from Cesare, a fact that was corroborated by Cesare himself and by cell phone records produced by the plaintiff.

Palermo's testimony regarding the relevant events was less reliable. Although Cesare testified that Palermo informed him about two visits from the Alvarados, Palermo could not recall at her deposition or at trial whether there was more than one visit. With respect to the visit that she does recall, Palermo testified that she was anxious and intimidated at the time. It seems most likely that the event Palermo recalled during her testimony was the Alvarados' second visit to Perfetto's office. Palermo recalled that there were three people present, two of whom were Jose and Mayra; Jose and Mayra testified that two contractors accompanied them on the second visit, but Mayra testified that she waited in the car. In addition, as noted above, Palermo testified that she felt intimidated and called Cesare during the one visit by the Alvarados she was able to recall; Cesare testified that he received a call from Palermo during the Alvarados' second visit,

8

and that Palermo told him that she felt intimidated.  Thus, it seems that Palermo either does not recall the first visit, that she has confused the two visits, or that she was not in fact even present during the first visit and Jose and Mayra met with another member of Cesare's staff.  Although Palermo testified that she did not receive a package containing invoices from the Alvarados, her testimony in this regard – particularly because the Alvarados stated that they delivered the package on their first trip, which Palermo seems not to recall at all – is unreliable.  Indeed, at her deposition, Palermo was not certain that the Alvarados did not leave a package; only when testifying at trial did Palermo state definitively that no package was delivered, and her certainty seemed to be based more on Cesare's testimony denying having received the invoices than upon her own independent recollection.  Cesare's recollection of events is also not entirely reliable, as he testified that his conversation with Jose on November 24 lasted five to ten minutes, when cell phone records document that the call, as Jose testified, lasted for forty-three minutes.

For all these reasons, I find that plaintiff has established by a preponderance of the evidence that the Alvarados personally delivered written notification to Perfetto in accordance with § 137(3).  Accordingly, I need not reach the issue of whether oral notification alone is sufficient under the statute.  I now turn to the question of whether the content of the notice was sufficient under § 137(3).

      b.  *Content of the notice*

Plaintiff seeks $255,591 from Fidelity.  Defendant did not offer any evidence at trial or in its written summation disputing the amount owed.  Defendant does, however, argue that plaintiff failed to state this amount with "substantial accuracy" as required by § 137(3) because: 1) the invoices transmitted by MJJ included charges for work performed on a project for Cesare's brother, thereby overstating the amount sought from Cesare by approximately $19,000; and 2)

Jose orally represented to Cesare that the amount owed by BD to MJJ was a half million dollars, thus overstating the amount owed by approximately a quarter of a million dollars.

I find that plaintiff stated the amount owed with sufficiently substantial accuracy to satisfy § 137(3). The invoices provided to Cesare indicated the amount owed with respect to the construction project at issue. Although there were a few charges for work performed on a project for Cesare's brother, Cesare himself testified that he could discern the inapplicable amounts by looking at the invoices. Tr. 162-63. Moreover, for the reasons discussed above, I credit Jose's testimony that he told Perfetto almost the exact amount owed (a quarter of a million dollars) during their telephone conversation on November 24, and not Cesare's testimony that Jose stated that he was owed a half million dollars.

I also note that defendant would not have been prejudiced if in fact, as it contends, plaintiff *overstated* the amount owed by a quarter million dollars, or by the smaller amount of inapplicable charges included in the invoices. The reason for requiring notice of the amount owed by a subcontractor – here, BD – is to allow the general contractor to withhold payments in that amount otherwise due to the subcontractor until the outstanding claim is resolved. *See, e.g., Andrews,* 406 F.2d at 794 (noting that "[p]rime contractors can readily protect themselves against their subcontractors' defaults by making appropriate payment reservations or by exacting performance bonds"). Here, defendant contends that Jose claimed on the telephone with Cesare that MJJ was owed approximately half a million dollars, whereas the unpaid invoices delivered to Perfetto by the Alvarados totaled $274,499, and MJJ in fact seeks only $255,591— approximately $19,000 less than the amount indicated in the invoices. *Cf. Mason Tenders District Council Welfare Fund, Pension Fund, Annuity Fund, Training Fund v. Silveri*, 2001 WL 64738, at *8 (S.D.N.Y. Jan. 25, 2001) (limiting plaintiff's recovery to the amount specified in its

notice where plaintiff sought more money in its complaint than in its notice to the contractor). *See also Liles Constr. Co. v. United States*, 415 F.2d 889, 891 (5th Cir. 1969) (overestimate of amount due was substantially accurate under the Miller Act). Accordingly, defendant cannot argue that Perfetto would have withheld additional sums from BD had MJJ more accurately stated the amount of its claim.

Defendant next argues that the "simple invoices" delivered by MJJ were inadequate because "they fail[ed] to achieve the fundamental necessity of the notification requirement—to convey an intent to pursue the prime contractor for payment." Def. 4/9/10 Ltr., Docket Entry 23, at 12. This argument also lacks merit.

First, defendant misconstrues the "fundamental" objective of the notice requirement. The purpose of Section 137 is twofold. The "primary" objective of Section 137 is to ensure that plaintiffs such as MJJ are compensated for labor performed on municipal construction projects. *Dutchess Quarry & Supply Co.*, 596 N.Y.S.2d at 900. Providing "protection to the prime contractor by fixing the date beyond which, in the absence of notice, he will not be liable for the subcontractor's debts " is a *subsidiary* purpose of the statute. *Andrews*, 406 F.2d at 794.

Second, Perfetto did have sufficient notice under the statute of MJJ's intention to hold it liable for the amounts due from BD. The statute requires only that claimant's written notification state with "substantial accuracy" 1) "the amount claimed" and 2) "the name of the party to whom the material was furnished or for whom the labor was performed." N.Y.S. FIN. LAW § 137(3). The invoices given by plaintiff to Perfetto contained sufficient information to comply with both of these requirements. *See* Pl. Ex. 8-13. *See also Am. Bldg. Contractors Assocs. v. MICA & Wood Creations LLC*, 804 N.Y.S.2d 109, 110 (2d Dep't 2005) (reversing

grant of summary judgment for defendant and holding that plaintiff was not required to state explicitly that it was seeking payment on a "bond claim.").

The Second Circuit has held, in the context of a Miller Act claim, that written notice "must inform the prime contractor, expressly or by implication, that the supplier is looking to the contractor for payment of the subcontractor's bill." *United States v. F.A. Baehner Inc.*, 326 F.2d 556, 558 (2d Cir. 1964) (internal quotation marks omitted). While there appear to be no other Second Circuit or New York state cases on point, more recent federal circuit decisions indicate that this intent to recover amounts that are owed by a subcontractor from a general contractor may be communicated by oral statements accompanying the written notice. *See, e.g., Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1437 (11th Cir. 1996) ("[T]he written notice and accompanying oral statements must inform the general contractor, expressly or impliedly, that the supplier is looking to the general contractor for payment so that it plainly appears that the nature and state of the indebtedness was brought home to the general contractor." (internal quotation marks omitted)); *United States v. Altech, Inc.*, 929 F.2d 1089, 1093 (5th Cir. 1991) (finding that plaintiff satisfied the notice requirement of the Miller Act where plaintiff orally informed the general contractor of the debt and presented invoices of the outstanding charges).

Although the written invoices here did not expressly state that MJJ was seeking payment from Perfetto for BD's debts, the Alvarados' two visits to Perfetto's office and the telephone conversations between Jose and Cesare leave no doubt that Jose communicated to Cesare that he was seeking payment from Perfetto.[2] Defendant emphasizes that Jose testified that he contacted Perfetto to put pressure on BD to pay MJJ. Tr. 39. Defendant, however, disregards the

---

[2] Defendant also contends that plaintiff's notice was inadequate because the invoices did not come with a cover letter alerting Perfetto to the nature of the invoices and some of the invoices were not marked "unpaid." Def. 4/6/10 Ltr. at 13. For the reasons discussed above, these arguments are without merit.

substantial other evidence indicating that Jose communicated that MJJ was seeking payment from Perfetto.[3]  For example, Jose testified that, during his telephone conversation with Cesare on November 24, Jose asked Cesare to pay MJJ directly instead of paying BD.  Tr. 48.  Jose further testified that the purpose of his two visits to Cesare's office was to get paid.  *See, e.g.*, Tr. 107.  In addition, Cesare testified that, when Palermo called him during the Alvarados' second visit to Perfetto's office, Palermo told him that the Alvarados were "demanding monies and . . . wanted to get paid for open invoices."  Tr. 134.  Thus, the written invoices, the two visits to Perfetto's office, the telephone conversations between Jose and Cesare, and Palermo's messages to Cesare, all communicated that MJJ was "looking to [Perfetto] for payment so that it plainly appear[ed] that the nature and state of the indebtedness was brought home to the general contractor."  *Maccaferri Gabions, Inc.*, 91 F.3d at 1437.

The evidence suggests that Perfetto's failure to protect itself was more a matter of choice than the result of lack of notice from MJJ.  Under § 137(3), a sub-subcontractor such as MJJ has 120 days from its last day of labor on the job to file a notice.  Plaintiff's last day of work on the job was in early October 2008; therefore, MJJ had until at least the beginning of February 2009 to provide notice of its claim against BD.  In its summation letter, Fidelity claims that Perfetto did not withhold payment to BD because it did not learn of MJJ's claim until March 2009; Fidelity argues that, "[a]t that juncture, a diligent prime contractor has already paid in full and can no longer guide its conduct, such as withholding payment to a nonperforming subcontractor, to encourage better performance."  Def. 4/9/10 Ltr., at 4.  The force of Fidelity's argument is

---

[3] Defendant cites to *H & E Equipment Services, Inc. v. Slater*, 2007 WL 2174595 (W.D. La. July 25, 2007) in support of its position.  Def. 4/16/10 Ltr. at 3-4.  In *H & E Equipment Services,* the court found that plaintiff's letter and oral communications to the general contractor did not expressly or impliedly communicate that plaintiff was looking to the contractor for payment.  2007 WL 2174595, at *3.  That case, however, is distinguishable from the present one because, in *H & E,* the plaintiff acknowledged that he never told anyone who worked for the general contractor that he expected the contractor to pay the subcontractor's debt.  *Id*. at *1-2.

13

undermined by the pertinent facts. Cesare acknowledged in his trial testimony that he knew MJJ claimed that BD was not paying its invoices as early as November 24 or 25, 2008, when he spoke to Jose on the telephone. Tr. 131-33. Defendant also concedes that Perfetto paid BD in full as of December 2008, Def. 4/6/10 Ltr. at 4, well before the expiration of the 120 day period provided for in § 137(3). Fidelity cannot complain that Perfetto was "unduly prejudiced with the [possibility] of having to pay a second time," Def. 4/9/10 Ltr. at 4, merely because Cesare chose not to avail himself of the protections afforded by the statute when he first learned of MJJ's claim.

For all of these reasons, I find that plaintiff has satisfied the notice requirements of § 137(3) and that Fidelity is therefore liable to plaintiff in the undisputed amount of $255,591.

B. Attorney's Fees

Plaintiff seeks attorney's fees pursuant to § 137(4)(c), which provides:

> In any action on a payment bond furnished pursuant to this section, . . . the court may determine and award reasonable attorney's fee to either party to such action when, upon reviewing the entire record, it appears that either the original claim or the defense interposed to such claim is without substantial basis in fact or law.

Defendant contends that plaintiff's fee application should be denied because determining whether plaintiff delivered written notice of its claim required a credibility assessment on disputed facts. I agree with defendant's argument. Moreover, I note that the question of whether oral notification is sufficient under § 137(3) is not well-settled, a point that plaintiff also recognizes in its summation letter. *See* Pl. 4/16/10 Ltr., Docket Entry 26, at 3. Thus, had defendant demonstrated at trial that plaintiff failed to provide written notice, this case would have presented a close question of law as to whether plaintiff's oral communications to Cesare were sufficient under § 137(3). For these reasons, I find that the defense interposed by Fidelity had a basis in law and in fact, and I therefore deny plaintiff's application for attorney's fees.

## **Conclusion**

For all of the reasons stated above, defendant Fidelity is liable to MJJ in the amount of $255,591.  The Clerk of the Court is directed to enter judgment in plaintiff's favor in that amount.  Plaintiff's application for attorney's fees is denied.

**SO ORDERED.**

/s/
**STEVEN M. GOLD**
**United States Magistrate Judge**

Brooklyn, New York
May 25, 2010

U:\IRM 2008-2009\MJJ v. BD\MJJ v. BD_bench trial_smg.docx